**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MARIA VIANEY MEDINA-COPETE
and RAFAEL GOXCON-CHAGAL.

      Defendants - Appellants.

Nos. 13-2026 & 13-2035

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. Nos. 1:11-CR-2002-JB-2 and 1:11-CR-2002-001 JB)**

---

Kevin Nault, (Amy Sirignano on the briefs) Law Office of Amy Sirignano, Albuquerque, New Mexico, for Defendant-Appellant Maria Vianey Medina-Copete.

Kari Converse, Assistant Federal Public Defender, (Joseph W. Gandert, Assistant Federal Public Defender, on the briefs) Office of the Federal Public Defender, District of New Mexico, Albuquerque, New Mexico, for Defendant-Appellant Rafael Goxcon-Chaga

David N. Williams, Assistant United States Attorney (Steven C. Yarbrough, Acting United States Attorney, with him on the briefs), Office of the United States Attorney, District of New Mexico, Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **LUCERO**, **GORSUCH**, and **MATHESON**, Circuit Judges.

**LUCERO**, Circuit Judge.

These appeals, brought to us by Maria Vianey Medina-Copete ("Medina") and Rafael Goxcon-Chagal ("Goxcon") following their convictions on drug trafficking charges, requires us to consider an issue of first impression in our circuit. During the trial, the district court allowed a purported expert on certain religious iconography to testify that veneration of a figure known as "Santa Muerte" was so connected with drug trafficking as to constitute evidence that the occupants of the vehicle were aware of the presence of drugs in a secret compartment. In addition to qualifying a law enforcement official as an expert on Santa Muerte, the district court allowed the witness to wander far afield and render theological opinions about the "legitima[cy]" of Santa Muerte vis-à-vis other venerated figures.

We conclude that the law enforcement officer was improperly vetted under Fed. R. Evid. 702, Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and that the testimony thus proffered was both impermissible and prejudicial, requiring us to reverse the convictions and order a new trial. Exercising jurisdiction under 28 U.S.C. § 1291, we vacate and remand.

**I**

**A**

On June 28, 2011, Goxcon was driving a pickup truck on Interstate 40 in New

Mexico, with Medina in the passenger seat. New Mexico State Police Sergeant Arsenio Chavez stopped the truck for following another vehicle too closely. Upon approaching the vehicle from the passenger side, Chavez requested Goxcon's driver's license as well as registration and proof of insurance for the vehicle. Although Chavez testified that Goxcon and Medina appeared to have difficulty locating the registration and insurance information, he later stated that he received the registration, insurance, and Goxcon's Oklahoma driver's license in approximately twenty seconds. Chavez also noticed an "overwhelming odor of air freshener emitting from the vehicle."

Goxcon's hand was shaking when he handed over the documents. Chavez testified that Goxcon became more nervous after being asked about the owner of the vehicle. Goxcon gestured towards the paperwork, but had trouble identifying the owner.

Medina also exhibited visible nervousness during the stop. She appeared to be praying. Chavez testified that "[s]he was fidgeting around, her legs were shaking, and . . . she was reading [a] document during the course of the stop." He said that the document "looked like some type of prayer of some sort." A translation of the prayer was introduced at trial. It reads:

> For protection during a trip
> Holy Spirit of Death, I invoke your Holy Name to ask you to help me in this venture. Make my way over the mountains valleys and paths an easy one, never stop bestowing upon me your good fortune weave the destiny so that bad instincts vanish before me because of your powerful protection. Prevent Santa Muerte problems from growing and embracing my heart, my Lady, keep any illness from embracing my wings (Illegible)
> Glorious Santa Muerte* be my protector and light my path. Be my advocate before the redeemer. Be my truth in times of darkness

Grant me the strength and faith to invoke your name and to thank you now and forever for all your favours

Amen

Oh miraculous Santa Muerte, Niña Blanca of my heart and right arm of god our lord. Today I come to you with infinite devotion to implore you for health, fortune and luck

Remove from my path (illegible) that hurts me, envy and misfortune; don't allow my enemy's slander reach and harm my spirit

may no one prevent me from receiving the prosperity that I am asking of you today
my powerful lady bless the money that will reach my hands and multiply it so that my family
lacks for nothing and I can outreach my hand to the needy that crosses my path

keep tragedy pain and shortage away from me
this votive candle I will light so that the radiance of your eyes forms an invisible wall around me
grant me prudence and patience holy lady, Santa Reina de las Tinieblas ("Holy Queen of Darkness") strength, power and wisdom tell the elements not to unleash their fury wherever they cross paths with me take care of my happy surroundings and that I want to adorn decorate

in my Santa Muerte
amen

(Page breaks omitted).

Chavez also testified that Goxcon and Medina told inconsistent stories. When he spoke with them separately, both Goxcon and Medina indicated that they were traveling to Oklahoma, but Chavez stated that they provided different accounts as to the length of their visit and the people with whom they planned to stay. Goxcon said that they were traveling to visit family, but Medina said that they had no family in Oklahoma. Because Chavez speaks imperfect Spanish and Goxcon speaks imperfect English, the parties had

difficulty communicating throughout the stop. The record reveals that Chavez had difficulty conjugating Spanish verbs outside of the first-person form, leading him to ask questions such as, "I don't have any illegal firearms in this truck?"

Chavez issued a traffic citation, and then, "[b]ased on [his] training and experience and indicators that [he] had noticed," requested that Goxcon answer a few more questions. The "indicators" included the odor of air freshener, Goxcon's and Medina's nervousness, Goxcon's inability to identify the truck's owner, Medina's reading from the prayer, and the inconsistencies in their initial stories. Chavez also said that Goxcon's attire struck him as "kind of odd . . . like he was trying to fit in with the innocent motoring public" because people "typically don't wear an Army shirt with an Air Force hat."

In response to Chavez's additional questions, Goxcon denied having explosives, cocaine, marijuana, or heroin in the car. When Chavez asked if there was methamphetamine in the car, however, Goxcon's voice grew louder, and "he dropped his head and looked away from [Chavez]." Medina similarly denied the presence of explosives and other drugs, and Chavez testified that her demeanor also changed in response to Chavez's question about methamphetamine: "She had the piece of paper in her hand, and she was like crumbling it up. And [Chavez] also noticed, when [he] asked

about methamphetamine, she looked away from [him]."[1]

Chavez requested consent to search the truck and provided a consent form in Spanish, which both Goxcon and Medina signed. Chavez then deployed a drug-sniffing dog, which alerted to the area of the glove box on the passenger side. A subsequent search revealed a secret compartment concealed within the vehicle's dash area containing what was later determined to be two pounds of roughly 90% pure methamphetamine.

Goxcon and Medina were placed under arrest. Following their arrest, they were separately interviewed at an office of the United States Drug Enforcement Administration ("DEA"). DEA Agent Reynaldo Rodriguez, a native Spanish speaker, conducted the interview of Goxcon. Over the course of the interrogation, Goxcon initially referred to Medina as his girlfriend, then later began describing her as his wife. Goxcon told Rodriguez that he was traveling from Las Vegas to Tulsa in order to pick up several items—furniture, tools, and a refrigerator—from a storage facility to bring them back to Las Vegas. Goxcon was initially unable to identify where he planned to stay, but he eventually provided the name of a friend who might host him. Goxcon said that the truck belonged to Julio Lopez, but that he had picked it up at the home of Julio's brother, Goyo.

DEA Supervisor Eduardo Chavez, another native Spanish speaker, interviewed

---

[1] Reflecting Chavez's difficulty communicating in Spanish, he used a word for "methamphetamines" that sounds similar to the correct translation but is not precisely correct.

Medina. Medina said that she and Goxcon borrowed the truck from Pablo Perez and his brother Gregorio. She suggested that she and Goxcon would stay with an individual named Manuel Valdez in Tulsa.

Medina also had a brief interaction with Rodriguez, who escorted her to an interview with Border Patrol. Medina requested the opportunity to gather some personal items from the truck in which she had been traveling. She identified a black gym bag as hers. Rodriguez retrieved the bag, removed a piece of clothing, and discovered a loaded Walther P99 handgun.

In a superseding indictment filed May 8, 2012, Goxcon and Medina were jointly charged under 21 U.S.C. § 846 with conspiracy to possess with intent to distribute 50 or more grams of methamphetamine; under 21 U.S.C. § 841(a)(1) and (b)(1)(A) with possessing with intent to distribute 50 grams and more of methamphetamine; and under 18 U.S.C. § 924(c)(1)(A) with using or carrying a firearm in relation to a drug trafficking crime. Medina was also charged with being an "illegally present" alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2), and with illegal reentry in violation of 8 U.S.C. § 1326(a) and (b).

**B**

At their joint trial, Medina and Goxcon asserted that they were unaware of the presence of the methamphetamine in their borrowed truck. Two expert witnesses supported the government's challenge to the defendants' account: United States Marshal Robert Almonte of the Western District of Texas and DEA Agent Ivar Hella, who also

served as the government's case agent. Both defendants challenged the qualifications of these expert witnesses in pretrial motions. In two separate orders, the district court found that Almonte and Hella were qualified to testify under the test enunciated by the Supreme Court in Daubert and Kumho Tire.

Almonte, who holds a Bachelor of Science degree from Park University, has more than 25 years' experience in law enforcement, primarily with the El Paso, Texas Police Department. He has published two books: Evolution of Narcotics Investigations and Managing Covert Operations. Almonte produced a law enforcement training video entitled Patron Saints of the Mexican Drug Underworld based on his "extensive research" beginning in 2003 and "comprising hundreds, if not thousands[,] of hours of study" regarding "how the Mexican drug traffickers involve the spiritual world in their activity." He is currently writing a book on the same topic and is a frequent lecturer at state law enforcement associations. The government described Almonte as a "cultural iconography hobbyist." His research includes "visit[s to] several shrines of [Mexican drug traffickers'] patron saints throughout Mexico, Spain, and the United States." According to Almonte, such saints include the Virgin of Guadalupe, Saint Jude, Saint Raymond Nonnatus, Santa Muerte, and others.

Following its recitation of Almonte's credentials, the district court concluded that Almonte could testify as an expert because Santa Muerte veneration "relates to the tools of the narcotics trade, which the Tenth Circuit has recognized may require expert assistance to aid the jury." Because "[e]xpert testimony is liberally admissible under the

Federal Rules of Evidence," and Almonte had "considerable qualifications for a law enforcement officer," the district court permitted him to testify as an expert. It further found that his opinion was "sufficiently reliable" largely based on other courts' conclusions that "the presence of personal items related to so-called narco saints can support a conclusion that a defendant was engaged in drug trafficking." Concluding that it "cannot say that Almonte has an unreasonable basis for his conclusions, a lack of a sufficient basis for his opinion, or that he has in an unreliable manner applied his experience to the facts of the case," the district court found "that Almonte's opinion is reliable."

The district court further ruled that Almonte's proposed testimony did not violate Fed. R. Evid. 704(b) (prohibiting expert testimony on "a mental state or condition that constitutes an element of the crime charged or of a defense"), that it was not improper profile evidence, and that it was not precluded by the First Amendment or Fed. R. Evid. 610 (prohibiting admission of evidence of "a witness's religious beliefs or opinions . . . to attack or support the witness's credibility"). In a separate order, the district court also permitted Hella to testify as an expert on "the modus operandi of drug organizations, the tools of the trade of drug trafficking, and . . . general aspects of narcotics investigations."

At trial, Almonte told the jury that he had spent "easily into the thousands of hours" researching the patron saints of the Mexican drug underworld and had been "qualified as an expert witness in court" regarding the topic. He described Santa Muerte as follows:

Well, I think it's hard to say exactly what Santa Muerte is, but what I found is that she would be a spirit, or some people consider her the angel of death. Some people have given her saintlike status. Not to say that she's a Catholic saint, because she's not a real person, so she could never be a Catholic saint. But people have given her saintlike status, and that goes with her name Santa, which means saint or holy. A lot of people believe that she goes all the way back to the pre-Christian belief of the Aztec God of Death. . . .

So, basically, I think, depending on who you ask, she's going to be any one of those, but pretty much one and the same. Not the Grim Reaper. The Grim Reaper represents death. Santa Muerte is considered the angel of death or saint of death or holy death.

A lot of people believe that—they'll pray to Santa Muerte. She'll answer their prayers, whatever those prayers may be.

In conducting my research throughout Mexico it became apparent to me that with a lot of people Santa Muerte became more popular than the Virgin Mary, and in some cases more popular than Jesus Christ himself.

Asserting that Santa Muerte veneration is "not recognized by the Catholic Church either in Mexico or the United States," Almonte testified, "[a]s a matter of fact, the Catholic Church in Mexico and in [the] United States does not condone the prayer or worship of Santa Muerte."

Almonte stated that individuals pray to Santa Muerte "[f]or different reasons, depending on who's praying to her, but very often in my line of work and what I train . . . very often criminal drug traffickers and other criminals pray to her for protection from law enforcement or anybody else they consider to be their enemy." He identified the prayer that Medina was holding at the time of her arrest as a "typical" prayer to Santa Muerte, then opined, "the purpose of a prayer like this, this particular prayer I would say would be protection from law enforcement." This opinion about the prayer was based on the absence of "anything about protection from a traffic accident. It's talking about

protection from enemies, protection from, I guess, people that are jealous." Almonte added:

> the thing that is most glaring to me in this prayer is . . . it says, "may no one prevent me from receiving the prosperity that I am asking of you today my powerful lady bless the money that will reach my hands and multiply it so that my family lacks for nothing and I can outreach my hand to the needy that crosses my path." So it's my opinion that this trip had something to do with gaining some money.

He also said that "[t]he theme mentioned in that prayer . . . is . . . common among traffickers who use Santa Muerte."

According to Almonte's testimony, non-criminals also pray to Santa Muerte. He acknowledged the possibility that she could be "use[d]" for "noncriminal-related purposes." But he also said that the prayer found in Medina's hands, even without other evidence of criminal activity, "would be a very good indicator of possible criminal activity based on that one statement there about making some—some money. Absolutely." Contrasting the Santa Muerte prayer with a hypothetical prayer to St. Jude, which would not "be an indicator unless the officer observed other suspicious behavior or items in the vehicle," Almonte said that "St. Jude is a legitimate Catholic saint" and a criminal praying to St. Jude would be "misusing him."

Hella testified that "the majority of the methamphetamine [sold in America] is produced in Mexico, smuggled in various means across the border, and distributed." He described for the jury the distinctive smell of methamphetamine that "almost makes you kind of reel when you get a little bit too much of a whiff of it." According to Hella,

people transporting drugs by private vehicle attempt to make the travel "seem very legitimate . . . they make steps to be sure that the vehicle's not registered to someone with a prior conviction for trafficking narcotics . . . . They want to make sure . . . the lights are functioning properly a lot of times, and it's in good working order."

The prosecutor asked Hella to define the term "blind mule." He testified that the term is "used to describe someone with absolutely no knowledge. It can be applied to legitimate, illegitimate transportation, but, essentially, it's someone with absolutely zero knowledge of what they're trafficking . . . someone with absolutely no knowledge of the narcotics they're transporting or that they are transporting narcotics." The prosecutor then asked, "in your personal experience as a DEA agent, have you ever been able to corroborate a story of a blind mule or information provided by a blind mule?" Hella answered, "[n]o," and proceeded to describe several risks involved in a drug-trafficking organization using a blind mule: "potentially a mechanic may have to work in the area where the narcotics are secreted . . . [y]ou don't know where that vehicle's going. I guess it's kind of a hope-and-a-prayer technique."

The jury returned a guilty verdict on all charges against both defendants. Medina was sentenced to a total of 180 months' imprisonment: three concurrent 120-month sentences for conspiracy, possession with intent to distribute, and being an illegal alien in possession of a firearm; a 24-month sentence (also concurrent) for illegal reentry; and a 60-month consecutive sentence for carrying a firearm during and in relation to a drug trafficking offense. Goxcon also received 180 months' imprisonment: two concurrent

120-month sentences for conspiracy and possession with intent to distribute and a 60-month consecutive sentence for carrying a firearm during and in relation to a drug trafficking offense. Both defendants filed timely notices of appeal.

**II**

Both defendants contend that the district court erred in permitting Almonte to testify. They argue that Almonte's testimony violated Fed. R. Evid. 403, 702, and 704(b), as well as their First Amendment rights.

Our review of a district court's ruling on the admissibility of expert testimony under Rule 702 involves a two-step process. "We review de novo whether the district court employed the proper legal standard and performed its gatekeeper role in determining whether to admit or exclude expert testimony." United States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quotation omitted). We then "review for abuse of discretion the manner in which the district court performs this gatekeeping role." Id. Our review at the second step "is deferential: we will not disturb the ruling unless it is arbitrary, capricious, whimsical or manifestly unreasonable, or we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (quotations omitted).

The Supreme Court described the gatekeeping role required of district courts with respect to expert testimony in two key cases. The first, Daubert, involved a number of experts who sought to testify—on the basis of test tube and animal studies, pharmacological studies, and "reanalysis" of previous epidemiological studies—that a

- 13 -

drug could cause birth defects. 509 U.S. at 583. The Supreme Court announced that "under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589. Testability, peer review and publication, the known or potential rate of error, and general acceptance were listed among the factors in what the Supreme Court emphasized was a flexible inquiry as to the reliability of proffered expert testimony. Id. at 593-95.

Kumho Tire expanded the Daubert inquiry to cover expert testimony that is not purely scientific. The Court held that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Id. at 142. It nonetheless emphasized "the importance of Daubert's gatekeeping requirement." 526 U.S. at 152. "The objective of that requirement . . . is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. Affirming the district court's refusal to allow an expert witness to testify, the Supreme Court "found no indication in the record that other experts in the industry use [the expert's] two-factor test," and noted that the parties did not "refer to any articles or papers that validate [the expert's] approach." Id. at 157. The Court reemphasized an earlier holding that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." 526 U.S. at 157 (citing General Elec. Co. v. Joiner, 522 U.S. 136,

146 (1997)).

Applying the two-step test in <u>Nacchio</u>, we conclude on de novo review that the district court employed the correct legal standard in evaluating Almonte's testimony. 555 F.3d at 1241. In its 67-page Memorandum Opinion and Order, the district court identified the law governing its evaluation of Almonte's fitness to testify as an expert and applied that law to the facts before it.

Our application of the second step requires us to reach an issue of first impression in this circuit: whether an expert witness may offer opinion testimony pursuant to Fed. R. Evid. 702 about the connection between so-called "narco saint" iconography and drug trafficking. We hold that the district court abused its discretion by permitting Almonte's expert testimony. Our inquiry begins with the text of Fed. R. Evid. 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b) the testimony is based on sufficient facts or data;
> c) the testimony is the product of reliable principles and methods; and
> d) the expert has reliably applied the principles and methods to the facts of the case.

Consistent with the text of the rule, the district court order first analyzed Almonte's qualifications and the helpfulness of his testimony to the jury, and then proceeded to a discussion about the reliability of his testimony.

**A**

In assessing Almonte's qualifications, the district court relied on familiar

- 15 -

precedent holding that "a drug dealer's tools of the trade" are an appropriate subject for expert testimony. See United States v. McDonald, 933 F.2d 1519, 1522-23 (10th Cir. 1991). The district court acknowledged that "Almonte's proposed testimony is somewhat different from a typical case where a law enforcement officer seeks to testify on tools of the drug trade," but it nonetheless concluded that Almonte's testimony could be helpful to the jury, in part because "[d]rawing the connection between a religious icon and drug trafficking is not a straightforward matter." On appeal, the government asserts that "[t]he Santa Muerte evidence related solely to the tools of the drug traffickers' trade."

Further inquiry into the analogy of religious veneration to "tools of the trade" would have been appropriate. In McDonald, the tools of the trade we listed included "a single-edge razor blade, a pager or beeper, and a loaded pistol . . . [,] $990 cash and $20 in food stamps." 933 F.2d at 1522. We explained that "the razor blade is at least circumstantial evidence suggesting Defendant possessed the means to cut the rock cocaine and thus intended to distribute." Id. We also explained how expert testimony with respect to the money and food stamps was useful to the jury: "Without understanding the drug trade is a cash-and-carry business, and that both cash and food stamps are the medium of exchange in a drug transaction, the basic evidence would leave a juror puzzled." Id. In United States v. Robinson, 978 F.2d 1554 (10th Cir. 1992), we discussed the relationship between tools of the trade and physical evidence indicating gang membership. Id. at 1563 (stating that gang-related items were "similar to" tools of the trade). Our decision in Robinson affirmed the district court's decision to permit an

- 16 -

expert to testify about gang affiliation, holding that "associational evidence may be directly relevant on . . . conspiracy," id. at 1562, and noting "the uncontroverted evidence that the main purpose of the Crips was to traffic in crack cocaine," id. at 1563.

Missing from the district court's discussion of Almonte's qualifications is any discussion of how his Santa Muerte testimony could legitimately connect Medina's prayer to drug trafficking. There is no evidence that Santa Muerte iconography is "associational," nor was there any allegation that the "main purpose" of Santa Muerte veneration "was to traffic in" narcotics. Cf. id. at 1562, 1563. Almonte testified that there may be "millions" of followers of Santa Muerte, but he proffered no manner of distinguishing individuals who pray to Santa Muerte for illicit purposes from everyone else. His data comes from his work as a narcotics detective and his compilation of "several cases from law enforcement officers throughout the United States where these items have been involved in drug trafficking and other criminal activity." Mere observation that a correlation exists—especially when the observer is a law enforcement officer likely to encounter a biased sample—does not meaningfully assist the jury in determining guilt or innocence.

We are also perplexed by the government's argument that Santa Muerte veneration is a tool of the drug trade. "[T]ools of the trade" are "means for the distribution of illegal drugs." United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991) (quotation omitted). The government has persistently failed to explain how the Santa Muerte iconography in this case was a "means for the distribution of illegal

- 17 -

drugs."[2] And in the context of proposed expert testimony about "tools of the trade," the trial court's gatekeeping function should include an inquiry about how the alleged tool serves as a means of distribution. The district court erred by making no such inquiry in this case.

Despite reiterating the word at trial and throughout its appellate briefs, the government acknowledged at oral argument that "use" was an odd verb to describe the relationship between Santa Muerte and those who venerate her. We agree. It is easy to describe how a drug trafficker might "use" a razor blade to cut narcotics for distribution, McDonald, 933 F.2d at 1522, a scale to weigh them, Robinson, 978 F.2d at 1563, and small baggies to package them, United States v. Triana, 477 F.3d 1189, 1195 (10th Cir. 2007). But the government's inability at every stage of litigation to explain precisely how Santa Muerte can be "used" elucidates the poor fit between our "tools of the trade" jurisprudence and Almonte's purported area of expertise. It also highlights that further inquiry by the district court would have revealed that Almonte's testimony would not properly "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

---

[2] The district court cited with approval another district court that held, "Jesus Malverde paraphernalia can be considered as 'tools of the trade': these items are perfectly legal, and yet can be used illegitimately in a drug trafficking scheme." United States v. Bobadilla-Campos, 839 F. Supp. 2d 1230, 1234 (D.N.M. 2012) (emphasis in original). We reject such a broad definition of "tools of the trade," which would logically include literally every legal item used or carried by a person who is committing a drug distribution offense. Our precedent requires some showing that a "tool of the trade" can be used as a "means for the distribution of illegal drugs."

**B**

The district court's failure to fully examine how Almonte's testimony would assist the jury also affected its reliability analysis. We begin by acknowledging that "the Rule 702 inquiry [is] a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case." Kumho Tire, 526 U.S. at 150 (citations and quotations omitted). As we have held, "the reliability criteria enunciated in Daubert are not to be applied woodenly in all circumstances." United States v. Garza, 566 F.3d 1194, 1199 (10th Cir. 2009). Despite the flexibility granted to district courts, the text of Rule 702 requires that they ensure that proffered expert testimony be "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702(b) & (c).

The district court acknowledged its role in determining "whether the witness' conclusion represents an 'unfounded extrapolation' from the data." But it failed to account for the complete absence of data supporting Almonte's testimony, instead conflating Almonte's "experience" with the "facts or data" contemplated by the text of Rule 702. Judge Kelly of the Eighth Circuit, concurring in a case involving testimony by Almonte, highlighted one of the problems with allowing Almonte to testify as an expert based on his experience:

> Marshal Almonte's conclusions are not the product of his personal law enforcement knowledge and experience—he did not gather the information about these prayers and beliefs through surveillance, wiretaps, or even

- 19 -

interviews of persons involved in this type of drug trafficking. Instead, Marshal Almonte calls upon his own self-study of the "iconography of the Mexican drug underworld," his observations of such icons in narcotics cases, his "four or five" trips to Mexico, and his self-published materials and training seminars on the subject.

United States v. Holmes, Nos. 13-1660 & 13-1661, 2014 WL 1876127, at *6 (8th Cir. May 12, 2014) (publication in F.3d forthcoming). In Garza, we held that "police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters." 566 F.3d at 1199. But witnesses "relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000 Amendment). Nothing in the record provides the necessary connection. Almonte served for roughly 25 years as a police officer in El Paso, and during that time he "learned that Mexican drug traffickers were praying for protection from law enforcement." More than ten years ago, he began "conducting extensive research on how the Mexican drug traffickers involve the spiritual world in their activity." That research includes "visit[ing] several shrines of their patron saints throughout Mexico, Spain, and the United States" and "compil[ing] several cases from law enforcement officers throughout the United States where these items have been involved in drug trafficking and other criminal activity." We have already noted the absence of any explanation about how "visit[ing] several shrines" or "compil[ing] several cases" leads Almonte to the conclusions he reached in this case. We are forced to conclude that Almonte's "opinion evidence [was] connected to existing data

- 20 -

only by the ipse dixit of the expert." Kumho Tire, 526 U.S. at 157.

## C

The district court reasoned that "[n]othing about Almonte's opinion appears to be an 'unfounded extrapolation,' given that various courts have recognized that evidence relating to so-called narco saints may be legitimate evidence that drug trafficking took place." This begs the question. In exercising its gatekeeping role, the district court was required to determine whether Almonte's proposed testimony was sufficiently reliable. That other courts may have permitted "evidence relating to so-called narco saints" has minimal bearing on the issue in this case, which required the district court to determine whether a law enforcement officer and "cultural iconography hobbyist" can testify as an expert on "the use of Santa Muerte and drug trafficking." When "established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). To the extent that the district court found that Almonte relied on "established methods," its attempt to justify the Santa Muerte testimony under our "tools of the trade" jurisprudence was strained at best. And the record is devoid of "indications of reliability" related to Almonte's opinion testimony.

Our colleagues in the United States Court of Appeals for the Eighth Circuit recently held that a district court did not abuse its discretion when it decided that Almonte was qualified to render expert testimony about Jesus Malverde, which the court described as "a 'narco-saint' hailed as a 'Mexican Robin Hood.'" Holmes, 2014 WL

1876127, at *1-2. The Eighth Circuit held that the Jesus Malverde opinion provided evidence of a "modus operandi" and was admissible based on Almonte's experience in law enforcement. Id. at *2. Citing Eighth Circuit precedent allowing law enforcement officers to testify "about the drug trafficking connection of otherwise innocuous household items," such as Ziploc bags, our colleagues held that "even if many with Malverde statues are not affiliated with the drug trade, narco-saint iconography may be an indicator of drug trafficking." Id. We find the analogy lacking. The potential "drug-trade application" of Ziploc bags is quite apparent: They can be used to package narcotics for distribution or sale. Neither the Eighth Circuit nor the government in the present case points us to any conceivable "drug-trade application" of Santa Muerte or Jesus Malverde. We have already quoted the opinion of the concurring judge, who would have held Almonte's testimony was erroneously admitted but concluded the error was harmless. Id. at *6 (Kelly, J., concurring). The concurrence's analysis of Almonte's qualifications is far more persuasive than the majority's assertion that Almonte has sufficient "personal knowledge and experience" to expertly opine on religious practices as they could conceivably relate to the drug trade. Id. at *2; see id. at *6 (Kelly, J., concurring).

**D**

We summarize the several errors made in the district court's discussion of Almonte's proposed testimony. First, it applied our "tools of the trade" jurisprudence to Almonte's purported area of expertise without considering whether a prayer could qualify

- 22 -

as a "tool of the drug trade" as we have previously used that phrase. Second, it allowed Almonte to testify as an expert based on his experience without considering the relevance or breadth of that experience, thereby eliding the "facts or data" requirement found in Rule 702(b). Third, it engaged in circular reasoning in determining that Almonte's opinion was not an "unfounded extrapolation," relying on other courts' treatment of facially similar testimony in very different contexts instead of the manner in which Almonte's techniques and methodology led to his opinion.

These errors constituted an abuse of discretion. Almonte should not have been permitted to testify under Fed. R. Evid. 702 because his experience did not render him qualified as an expert on the connection between Santa Muerte worship and drug trafficking, his knowledge did not assist the jury, and his opinion was not based on the proper application of reliable principles and methods. Because we hold that Almonte should not have been permitted to testify under Rule 702 and proceed to vacate the relevant convictions, see Part IV, infra, we do not need to consider the appellants' challenges to his testimony pursuant to the First Amendment or Rules 403 or 704(b).

### III

We briefly address the remaining allegations of error that may be relevant should the government choose to re-try Goxcon and Medina.

### A

Medina alleges that Hella's testimony was irrelevant. We review evidentiary decisions, including determinations of relevance, only for an abuse of discretion. United

- 23 -

States v. Sanchez, 725 F.3d 1243, 1250 (10th Cir. 2013). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "[T]he threshold for relevance under the Federal Rules of Evidence is not a high one," United States v. Cerno, 529 F.3d 926, 934 n.5 (10th Cir. 2008), requiring sufficient materiality and probative value to "provide a fact-finder with a basis for making some inference, or chain of inferences," United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007) (quotation omitted). The district court did not abuse its discretion by concluding that Hella's expert testimony was relevant; the testimony contextualized the evidence that the jury had already seen and provided a basis for the inference that, given the quantity and purity of the methamphetamine in the truck, it was less likely that Medina and Goxcon were unaware that it was present.[3]

**B**

Both defendants also allege that a portion of Hella's testimony violated Rule

---

[3] Medina's brief seems to suggest that the district court additionally erred by qualifying Hella as an expert pursuant to Rule 702. Medina's only argument with regard to Rule 702, however, is that the testimony "was not relevant and therefore not helpful to the jury." Because we reject Medina's relevance arguments pursuant to Rule 401, we are unpersuaded by her cursory references to Rule 702.

Medina's opening brief also suggests that Hella's testimony was prejudicial, referencing Fed. R. Evid. 403. "The exclusion of evidence under Rule 403 is an extraordinary remedy and should be used sparingly." United States v. Brooks, 736 F.3d 921, 940 (10th Cir. 2013) (quotation and ellipses omitted). Medina's occasional references to "prejudice" in this section of her brief are insufficient to convince us to invoke the "extraordinary remedy."

704(b). Expert witnesses in criminal cases are prohibited from opining about whether a defendant had "a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). Experts may "properly testify to facts or opinions from which the jury could conclude or infer that" a defendant had a required mental state, but the "final inference is for the trier of fact alone." United States v. Archuleta, 737 F.3d 1287, 1298 (10th Cir. 2013) (quotations omitted). Defendants raised a Rule 704(b) objection with respect to Hella's testimony before trial and renewed the objection at trial. The district court had cautioned the government that Hella "may testify about what he has seen in previous drug cases" but "may not . . . testify that the Defendants intentionally or knowingly engaged in drug trafficking based on the surrounding circumstances."

Medina now contends that Hella improperly testified "that, in his experience and opinion, there was no such thing as a 'blind mule' (a drug courier who is unaware of the presence of drugs) and no conceivable benefit to drug trafficking organizations in using blind mules." Therefore, Medina asserts, the jury either had to find that she "knew that the drugs were present, or disregard Hella's training and experience." We disagree. Our review of the transcript indicates that Hella did not deny the possible existence of blind mules and, although he appeared reluctant, agreed on cross-examination that there could be benefits for drug traffickers in using blind mules. We therefore find Medina's Rule

704(b) argument unpersuasive.[4]

C

Medina also asserts that the government failed to present sufficient evidence that she had knowledge of the presence of the methamphetamine. Although "the Double Jeopardy Clause does not bar the retrial of a defendant who has succeeded in getting his conviction set aside for error in the proceedings below," Lockhart v. Nelson, 488 U.S. 33, 39 (1988), retrial is impermissible when the evidence submitted at trial—including erroneously admitted evidence—is insufficient to support the verdict. See id. at 39-40. We therefore consider Medina's argument that the government failed to present sufficient

---

[4] Goxcon contends that Hella's assertion that he had never been able to corroborate the story of a blind mule violated Rule 704(b). The relevant exchange is reproduced below:

> [Prosecutor]: Okay. Now, in your personal experience as a DEA agent, have you ever been able to corroborate a story of a blind mule or information provided by a blind mule?
>
> [Hella]: No.

We agree with the government that plain error review is appropriate. See Archuleta, 737 F.3d at 1297 (10th Cir. 2013). There was no contemporaneous objection to this testimony, and the pre-trial objection failed to "indicate to the district court the precise ground" for Goxcon's argument, thereby depriving the court of the "opportunity to correct its action in the first instance." United States v. Winder, 557 F.3d 1129, 1136 (10th Cir. 2009) (quotation omitted). Thus, the district court did not make a discretionary ruling amenable to our review on this portion of Hella's testimony. We anticipate that this issue will not return to us on plain error review; if the government elects to retry these defendants, counsel has been alerted to the need for a contemporaneous 704(b) objection. We decline to address this issue. Cf. Doering ex rel. Barrett v. Copper Mountain, Inc., 259 F.3d 1202, 1213 & n.5 (10th Cir. 2001).

- 26 -

evidence that she had knowledge of the presence of methamphetamine. See United States v. Farr, 536 F.3d 1174, 1187 (10th Cir. 2008) (considering defendant's sufficiency of evidence challenge to determine "whether a retrial would expose her to impermissible double jeopardy" after finding reversible error based on constructive amendment of the indictment). "We review the sufficiency of the evidence to support a conviction de novo," United States v. Anaya, 727 F.3d 1043, 1050 (10th Cir. 2013) (quotation and ellipses omitted), "asking only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find [the defendant] guilty beyond a reasonable doubt," United States v. Kaufman, 546 F.3d 1242, 1263 (10th Cir. 2008) (quotation omitted). "We accept at face value the jury's credibility determinations and its balancing of conflicting evidence." United States v. Cardinas Garcia, 596 F.3d 788, 794 (10th Cir. 2010). Evidence must "reasonably support the jury's finding of guilt beyond a reasonable doubt." United States v. Bowen, 437 F.3d 1009, 1014 (10th Cir. 2006) (quotation omitted).

Construing the evidence in the light most favorable to the government, we do not agree that there was insufficient evidence to convict Medina. The evidence at trial showed that Medina was traveling in a truck with at least $30,000 worth of methamphetamine that was more than ninety percent pure. She exhibited nervousness during a traffic stop, and her behavior changed when she was questioned about the presence of methamphetamine. Additional evidence suggested that Medina claimed

ownership of a loaded weapon that was in the cab of the truck. The jury reasonably could have concluded that when Medina and Goxcon were interviewed by native Spanish speakers after their arrests, their stories conflicted. Four cell phones were taken from Medina and Goxcon, and there was evidence that the phones had not recently been used to contact either of the people with whom Medina and Goxcon claimed they might stay in Oklahoma. Moreover, the jury could reasonably have concluded from the prosecution's cross-examination of Medina that without a source of income other than what she had shared on the stand, the defendants could not have afforded the driving trips they had recently taken. The properly admitted evidence adduced at trial "reasonably support[s] the jury's finding that the defendant is guilty of the offense beyond a reasonable doubt." Kaufman, 546 F.3d at 1263.

## IV

Because we have concluded that the district court committed an error, we must determine whether that error was harmless. "A non-constitutional error," such as the admission of Almonte's testimony, "is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)). We must review the record as a whole in order to perform the harmless error analysis. United States v. Charley, 189 F.3d 1251, 1270 (10th Cir. 1999). The government has the burden of proving that any error is harmless. Id. at 1271.

We note that, although the government argued the cumulative error doctrine did not apply, it did not present any argument about the harmlessness of a single error in its briefing.  Despite our conclusion above that the evidence was sufficient to convict, we are unpersuaded under the different standard of harmless-error review that Almonte's testimony was harmless.  The highly prejudicial nature of Almonte's testimony leaves us with grave doubt that the outcome of the trial would have been the same without it.

At trial, the only contested issue involved the defendants' knowledge that there was methamphetamine in the secret compartment of the borrowed truck.  The record reveals that the knowledge issue was close.  Several government witnesses provided evidence relevant to the defendants' knowledge or lack thereof.  Evidence regarding the interaction between Chavez and the defendants is problematic because of the language barrier.  Although there were multiple air fresheners in the truck, a government agent testified that methamphetamine has a "chemical type of smell," and Medina testified that they purchased air fresheners because the people from whom they borrowed the truck "work in the carpet business and they bring people in, and there was a smell of like something moldy or dirt."  Goxcon and Medina had four cell phones, but Goxcon explained that one of the cell phones found in the truck did not work and another had a dead battery.  The government's case was far from airtight, even with Almonte's testimony.

Almonte's testimony, moreover, was significant to the government's case in at least two ways.  First, even omitting from our consideration the portions that were struck

by the district court,[5] Almonte's testimony suggested that the presence of the prayer was indicative of criminal activity. Although Almonte acknowledged that "people who are not associated with criminal activity also pray to Santa Muerte," his expert testimony characterizing the mere presence of the prayer as "a very good indicator of possible criminal activity" approaches psychobabble and substantially influenced the outcome. The prosecutor referred to Almonte's testimony in closing argument, saying "for that deniability to be truly plausible . . . you can't have all the saints and the prayers." He continued that the "saints and prayers, . . . when they're combined with other things they mean maybe something different."

Almonte's testimony was also highly prejudicial to the defendants. Although a discussion of the First Amendment implications of a law enforcement officer commenting on religious matters in a criminal case is not necessary to our holding, the ramifications cannot and should not be ignored. Almonte, speaking as an expert with the imprimatur of the trial court's approval, see United States v. Hill, No. 12-5154, 2014 WL 1663084, at *16 (10th Cir. Apr. 28, 2014) (publication in F.3d forthcoming) (jury instructions can "exacerbate the erroneous admission of . . . expert testimony" by suggesting to jury that witness possesses "specialized knowledge"), classified both Santo

---

[5] We generally assume that jurors follow their instructions. United States v. Urbano, 563 F.3d 1150, 155 (10th Cir. 2009). No less an authority than the Supreme Court, however, has said, "[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." Burgett v. Texas, 389 U.S. 109, 115 n.7 (1967) (quotation omitted).

Toribo Romo and Saint Jude as "legitimate Catholic saint[s]" in contrast to Santa Muerte, who he testified is "not a real person, so she could never be a Catholic Saint."[6] Almonte stated that "with a lot of people Santa Muerte became more popular than the Virgin Mary, and in some cases more popular than Jesus Christ himself." Almonte's testimony essentially painted the defendants in this case as heretics, holding beliefs "not recognized by the Catholic Church either in Mexico or the United States." He stated, "[a]s a matter of fact, the Catholic Church in Mexico and in [the] United States does not condone the prayer or worship of Santa Muerte." All of this may be true, but that is not the point. A criminal trial is no place for a theological disputation on sainthood and the power of prayer. We are left with grave doubt about the verdict given the extent of prejudice impermissibly injected into the trial by this testimony.

The harmless-error doctrine does not require us to precisely measure the damage caused by Almonte's testimony. It is sufficient for us to say that we have "grave doubt" about the outcome of this trial based on the substantive value of Almonte's testimony in demonstrating knowledge and its tendency to prejudice the jury against the defendants. Kotteakos, 328 U.S. at 765. We conclude that Almonte's testimony was not harmless

---

[6] In this case, several representatives of the federal government took it upon themselves to define—correctly or, as it appeared at times, not—the tenets of Catholic theology and the legitimacy of religious practices. Almonte, a representative of federal law enforcement, testified at length about which saints were "legitimate"; the prosecutors insisted (outside the presence of the jury) that "Santa Muerte is not a saint" (emphasis in original); and the district court quoted another district court that distinguished Santa Muerte from "legitimate saints." We urge the government to be cautious about appearing to take sides in theological debates.

- 31 -

with respect to counts one through three against both defendants and vacate the convictions on those counts against Medina and Goxcon.[7]

**V**

We **REMAND** to the district court with instructions to vacate all of Goxcon's convictions and Medina's convictions on counts one through three, and for further proceedings consistent with this opinion.

---

[7] Medina does not challenge her convictions on counts four and five, and we do not address them. Moreover, because we reverse and remand the convictions, we do not need to address the defendants' cumulative error arguments. See United States v. Glass, 128 F.3d 1398, 1408 (10th Cir. 1997). Similarly, because the appropriateness of a deliberate ignorance jury instruction depends on the facts presented at trial, United States v. Hillman, 642 F.3d 929, 939 (10th Cir. 2011), and the parties may adduce additional or different evidence if the case is retried, we do not address Medina's challenge to the jury instructions, cf. Doering, 259 F.3d at 1214.