**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 25, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

NABEEL AZIZ KHAN, a/k/a Sonny, a/k/a
Nabeel Aziz Kahn,

     Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

SHAKEEL KAHN,

     Defendant - Appellant.
_____

No. 19-8051

No. 19-8054

**Appeals from the United States District Court**
**for the District of Wyoming**
**(D.C. Nos. 2:17-CR-00029-ABJ-4 & 2:17-CR-00029-ABJ-1)**
_____

Mark Baker (Rebekah A. Gallegos, with him on the briefs), Peifer, Hanson, Mullins &
Baker, P.A., Albuquerque, New Mexico, appearing for Appellant Nabeel Aziz Khan.

Beau B. Brindley (Blair T. Westover, with him on the briefs), Chicago, Illinois,
appearing for Appellant Shakeel Kahn.

Stephanie I. Sprecher, Assistant United States Attorney (Mark A. Klaassen, United States Attorney; Stephanie A. Hambrick and David A. Kubichek Assistant United States Attorneys, with her on the briefs), Office of the United States Attorney for the District of Wyoming, Casper, Wyoming, appearing for Appellee.

_____

Before **BRISCOE**, **MATHESON**, and **CARSON**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Defendant Nabeel Aziz Khan ("Nabeel") and his brother, Defendant Dr. Shakeel Kahn ("Dr. Kahn," collectively "Defendants"),[1] challenge their drug trafficking and money laundering convictions following a jury trial in the United States District Court for the District of Wyoming. Defendants were tried together; they appeal separately. Because their appeals raise several overlapping issues, we address both appeals in this opinion.

We conclude that the search of Dr. Kahn's Arizona residence was proper. The magistrate judge who issued the warrant had a substantial basis for concluding that the affidavit in support of the warrant established probable cause. Further, the seizure of items not listed in the warrant was supported by the plain view doctrine. The searches of Dr. Kahn's Wyoming residence and Wyoming business were also proper. The district court's instruction regarding liability under § 841 was correct because this court has previously held that criminal liability under § 841 is

_____

[1] Although Defendants are brothers, they spell their last names differently. In the interest of clarity, we refer to Nabeel Khan by his first name, and Dr. Shakeel Kahn as "Dr. Kahn," as Defendants do in their briefing.

2

disjunctive, not conjunctive.  Nabeel's challenge to the district court's good faith instruction falls victim to forfeiture as he raises a different theory on appeal than he presented to the district court.  The district court's good faith instruction correctly stated the law as to Dr. Kahn because "good faith" is not a defense as to mens rea, but rather is a defense as to the lawfulness of a prescription.  The district court's intent instruction did not burden Dr. Kahn's right to testify on his own behalf because it did not direct the jury on how to weigh Dr. Kahn's testimony.  The evidence was sufficient to sustain Nabeel's conviction because the evidence shows Nabeel knew Dr. Kahn's prescriptions were unlawful.  And finally, the objectionable testimony identified by Dr. Kahn in his motion for a new trial was inconsequential in light of the overwhelming evidence of guilt.[2]  Accordingly, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I

In 2008, Dr. Kahn started a medical practice in Ft. Mohave, Arizona.  Later that year, Nabeel arrived in Arizona and began assisting with managing Dr. Kahn's practice.  Nabeel's responsibilities included checking patients in, taking their vitals such as blood pressure or body weight, and processing their payments.

After Nabeel's arrival, Dr. Kahn's practice shifted towards pain management.  Dr. Kahn regularly prescribed patients various controlled substances, including

---

[2] Dr. Kahn also initially raised a challenge to the district court's causation instruction.  Because Dr. Kahn conceded that issue on reply, we decline to address it.  *See* Dr. Kahn's Reply Br. at 22.

3

oxycodone, alprazolam, and carisoprodol. As time went on, Dr. Kahn spent less time with patients, and the patients he did see were almost exclusively for pain management. The prescriptions he wrote aligned closely with what patients were able to pay, rather than the patients' medical need; when patients were prescribed more pills, Dr. Kahn charged more for his medical services, and when patients could not afford the price of the prescription, Dr. Kahn prescribed fewer pills, or withheld a prescription entirely. The price of prescriptions also closely tracked the "street price" of the pills, which Dr. Kahn often discussed with patients. In addition to shifting towards pain management, Dr. Kahn's practice also shifted to a primarily "cash-only" basis, although he also accepted payment in personal property, including firearms.

After a patient died, Dr. Kahn commented "[s]he was probably selling her prescriptions for illegal drugs." App., Vol. VI at 2573.[3] In fact, many of Dr. Kahn's patients sold pills so they could afford their prescriptions. *See, e.g., id.* at 2566, 3559. Nabeel also spoke with at least one patient about a TV news report that described patients who illegally sold their prescription medication.

In 2013, Nabeel helped Dr. Kahn draft a "drug addiction statement," which patients were required to sign. By signing the drug addiction statement, patients swore that Dr. Kahn was not a "drug dealer," that they were not "addicts," and that they would be liable to Dr. Kahn, or his officers and agents, for $100,000 for any

---

[3] All citations to the record are to Appellant's Appendix in 19-8051, *United States v. Nabeel Khan*, unless otherwise specified.

4

civil or criminal action brought against Dr. Kahn, or his officers and agents, as a result of any action taken by the patient. *See id.*, Suppl. Vol. I at 134; *id.*, Vol. VI at 4461. At trial, an expert witness for the government opined that Defendants' "drug addiction statement" was neither an "appropriate" nor "acceptable" way to advise a patient. *Id.*, Vol. VI at 1418.

Beginning in late 2012, pharmacies in the Ft. Mohave area began refusing to fill prescriptions issued by Dr. Kahn. In 2015, Dr. Kahn opened a second practice in Casper, Wyoming. During that time, Dr. Kahn continued to travel to Arizona to see patients about once per month; other patients travelled to Wyoming to see Dr. Kahn. Nabeel also met patients in parking lots to exchange their prescriptions for cash. Dr. Kahn maintained offices and residences in both Arizona and Wyoming during this time, although he primarily resided in his Wyoming residence. Nabeel primarily resided at Dr. Kahn's Arizona residence. Nabeel also acted as office manager for the Arizona office. Dr. Kahn's wife, Lyn Kahn, acted as office manager for the Wyoming office. As part of her role as office manager, Lyn Kahn forwarded calls from the Wyoming office to her cell phone to schedule appointments and arrange payments.

In 2016, in the course of investigating Dr. Kahn's prescribing practices, the government intercepted a call between Dr. Kahn and Lyn Kahn. During that call, Dr. Kahn, while cleaning his Wyoming office, indicated that he would bring some patient files to his Wyoming residence. Pursuant to a warrant, officers searched Dr. Kahn's Arizona residence, his Wyoming residence, and "Vape World," a Wyoming business

5

owned by Dr. Kahn and Lyn Kahn. In searching Dr. Kahn's Arizona residence, officers seized patient files pursuant to the warrant; they also seized U.S. currency, firearms, and automobiles, although those items were not listed on the warrant as items to be seized.

Defendants and Lyn Kahn were charged in a 23-count indictment, alleging, among other charges, that the Defendants and Lyn Kahn conspired to dispense and distribute controlled substances resulting in death in violation of 21 U.S.C. §§ 841 and 846, that Defendants possessed firearms in furtherance of a federal drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), and Dr. Kahn engaged in monetary transactions derived from specified unlawful activity in violation of 18 U.S.C. § 1957 (money laundering). App., Vol. I at 327. Prior to trial, Lyn Kahn pled guilty to the conspiracy charge against her.

Defendants moved to suppress evidence gathered from the searches of Dr. Kahn's Arizona residence, his Wyoming residence, and Vape World. The district court denied that motion, except that it suppressed the seizure of any automobiles.

During the trial, a witness for the government, on direct examination, referred to Dr. Kahn being in jail. Dr. Kahn objected and moved for a mistrial. The district court denied the motion from the bench, and instead offered a curative instruction. The district court acknowledged, however, that it was "not sure" that its instruction would cure the prejudice caused by the witness's testimony. *Id.*, Vol. VI at 3858.

Defendants also objected to the district court's jury instructions regarding liability under § 841(a)(1), their respective "good faith" defenses, and intent. The

6

district court denied those objections. The jury returned a verdict of guilty on all counts, except that it acquitted Nabeel of causing the death of one of Dr. Kahn's patients. Dr. Kahn filed a Rule 33 motion reasserting his mistrial motion. In a written order, the district court ruled that a mistrial was unwarranted in light of the overwhelming evidence presented of Dr. Kahn's guilt. Defendants then filed timely notices of appeal.

## II

### A. The Search of the Arizona Residence and the Resulting Seizures Did Not Violate the Fourth Amendment

Both Defendants challenge the search of Dr. Kahn's Arizona residence, and the resulting seizures of U.S. currency and firearms not identified in the warrant. The government responds that the issue is waived through inadequate briefing and is without merit because the search was supported by probable cause, and the seizures were permitted under the plain view doctrine.

"When reviewing a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Petit,* 785 F.3d 1374, 1378–79 (10th Cir. 2015). "Once a magistrate judge determines probable cause exists, the role of a reviewing court is merely to ensure the [g]overnment's affidavit provided a 'substantial basis' for reaching that conclusion." *United States v. Biglow*, 562 F.3d 1272, 1281 (10th Cir. 2009); *see also United States v. Riccardi,* 405 F.3d 852, 860

7

(10th Cir. 2005) (review of magistrate judge's probable cause finding is "very deferential").

The warrant in question was issued by a magistrate judge for the District of Arizona. *See* App., Vol. III at 132. The warrant permitted seizure of financial and business records, electronic media, appointment books and schedules, controlled substances, and patient records for fifty-one specific patients. *Id.* at 134–36. The warrant did not include U.S. currency or firearms as items to be seized.

Drug Enforcement Agency ("DEA") Special Agent Brett Patterson authored an affidavit in support of the warrant. Special Agent Patterson had extensive experience and knowledge "of the methods used by drug traffickers to import illegal drugs from Mexico, store them in cities in border states, distribute them in those areas to local buyers or buyers from out-of-state, transport them to other parts of the United States for distribution, and collect and launder drug proceeds." *Id.* at 144. In his experience investigating "high-level narcotics trafficking organizations based in Phoenix, Arizona," Special Agent Patterson learned "that narcotic traffickers frequently maintain at their residence and businesses, books and records listing narcotic suppliers and purchasers, and similar books and records documenting those narcotic transactions." *Id.* But Special Agent Patterson did not attest to any specific expertise in investigating physicians accused of issuing unlawful prescriptions.

Special Agent Patterson identified "numerous red flags" in Dr. Kahn's prescribing behavior, including "extremely high dosage amounts, patients traveling from out of state, multiple patients from the same household receiving controlled

8

substance prescriptions, lack of individualized therapy, early refills, dangerous drug combinations and overlapping controlled substance prescriptions with Dr. Kahn's Arizona and Wyoming DEA registrations being utilized." *Id.* at 153–54. All fifty-one patients whose records were sought fell within that "pattern of suspicious prescriptions." *Id.* at 164. Only eight of those patients, however, were discussed with any specificity in the affidavit.

Special Agent Patterson also attested that investigators intercepted a phone call between Dr. Kahn and Lyn Kahn, in which Dr. Kahn said he would "take the charts home or whatever." *Id.* at 150. At the time of the call, Dr. Kahn was cleaning his medical office in Wyoming, and was returning to his Wyoming residence. Special Agent Patterson did not attest to when that call took place, although the district court concluded that it "could not have been older than about six months" based on the timing of the investigation. *Id.*, Vol. V at 1171.

In another intercepted call, Lyn Kahn informed a patient that Dr. Kahn travelled to Arizona once a month to practice medicine. Dr. Kahn kept a medical office in Arizona, with a sign reading "Shakeel Kahn, MD. By appointment only." *Id.*, Vol. III at 160. The Arizona medical office had a furnished waiting room and was current on its rent. Lyn Kahn also resided at the Arizona residence in October 2016, and she forwarded phone calls from the Wyoming medical office to her cellular telephone to "schedule appointments and arrange payments and money transfers." *Id.* at 159.

9

In one such call, occurring when Lyn Kahn resided at the Arizona residence, a patient asked Lyn Kahn if he should send money through Western Union for a prescription pickup. The patient also told Lyn Kahn that he would be bringing a new "client." *Id.* at 161. Lyn Kahn informed the patient that he would have to pay extra for a pickup on a Saturday, to which the patient replied that he would do whatever Dr. Kahn and Lyn Kahn wanted regarding the money. Special Agent Patterson attested that this call "demonstrates the exploitation of [Dr. Kahn's] position for profit and the cash for prescription scheme being conducted by Dr. Kahn." *Id.*

Special Agent Patterson opined that, due to the cash nature of Dr. Kahn's practice, Dr. Kahn "may utilize a safe to secure bulk cash at [the Arizona residence]." *Id.* at 150. Special Agent Patterson based his opinion on an intercepted call in which Dr. Kahn told Lyn Kahn that he needed to get a safe out of a store [Vape World] in Wyoming and bring it home. Special Agent Patterson also attested that Dr. Kahn had likely received over $3,000,000 for issuing prescriptions. *Id.* at 162.

When executing the warrant at the Arizona residence, officers discovered and seized approximately $1,000,000 in U.S. currency, over forty firearms, and at least one automobile.[4] Two safes were searched. Officers discovered the currency in

---

[4] The record is not entirely clear as to how many firearms and automobiles were seized. The district court only indicated that "more than 40 firearms, and at least one automobile" were seized. App., Vol. V at 1162. In his brief, Dr. Kahn asserts that "approximately 41 firearms, and 5 automobiles" were seized. Dr. Kahn's Br. at 7. Nabeel asserts that "five automobiles, and more than 40 firearms" were seized. Nabeel's Br. at 43. And the government responds that officers seized "49 firearms." United States' Dr. Kahn Br. at 27. The Search Warrant Receipt appears to

10

envelopes in one or both safes which Nabeel either opened voluntarily or provided access to the safe's combination. The firearms were scattered throughout the Arizona residence. Officers also discovered several different forms of identification; some had Nabeel's name, but someone else's picture, or Nabeel's picture but another name. During the execution of the warrant, Special Agent Patterson spoke with Nabeel. Nabeel informed Special Agent Patterson that the firearms belonged to him, that they were registered to Dr. Kahn, and that Nabeel was "not allowed" to have them. *Id.*, Vol. VI at 353. Nabeel also informed Special Agent Patterson that he was in the United States illegally and had previously used Dr. Kahn's identity, so that Dr. Kahn's insurance would pay for Nabeel's surgery.

### 1. *We Decline to Find a Waiver Based on Inadequate Briefing*

The government asserts that Defendants have waived their suppression arguments through inadequate briefing because Defendants failed to cite to the trial transcript. *See* Fed. R. App. P. 28(e) ("A party referring to evidence whose admissibility is in controversy must cite the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or rejected."). Defendants' opening briefs do, however, include citations to the relevant pretrial motions, exhibits, and the district court's suppression rulings. Further, Defendants provided citations to the trial transcript on reply. Thus, any alleged deficiencies do not frustrate our review of Defendants' suppression arguments. *See United States v.*

---

list 49 firearms and 5 automobiles. *See* App., Vol. II at 1007–09. In any event, the precise number of firearms and automobiles does not affect our analysis.

11

*Hall*, 473 F.3d 1295, 1303 (10th Cir. 2007) (treating an argument as waived where we could not "even attempt to assess the merits of [appellant's] argument"). Accordingly, we exercise our discretion in overlooking any waiver based on inadequate briefing and proceed to the merits. *See United States v. Mullikin*, 758 F.3d 1209, 1211 n.3 (10th Cir. 2014) (declining to determine whether argument was waived, where any error was harmless).

### 2. *Special Agent Patterson's Affidavit Established an Adequate Nexus between the Arizona Residence and Evidence of a Crime*

Both Defendants challenge whether the government established a nexus between the Arizona residence and evidence of a crime. Defendants assert that Special Agent Patterson lacked expertise in investigating medical practitioners suspected of unlawfully prescribing medication, and that the government had insufficient reasons to suspect Dr. Kahn stored medical or financial records at the Arizona residence.

"Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). "Whether a sufficient nexus has been established between a defendant's suspected criminal activity and his residence . . . necessarily depends upon the facts of each case." *Biglow*, 562 F.3d at 1279. "Certain non-exhaustive factors relevant to our nexus analysis include (1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep

12

such evidence." *Id.* Although neither "hard evidence" nor "personal knowledge of illegal activity" are required to demonstrate an adequate nexus, an affidavit must demonstrate "circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place." *Id.* (internal quotations omitted).

Here, the magistrate judge's probable cause finding to search the Arizona residence is supported by a substantial basis. Specifically, the Arizona residence is tied to Defendants' suspected drug trafficking in several ways: Dr. Kahn transported medical records from his Wyoming office to his Wyoming residence, he regularly travelled to Arizona to practice medicine, and he maintained an office and residence in Arizona. The involvement of Dr. Kahn's wife, Lyn, further ties the Arizona residence to the Defendants' illegal drug activity. Lyn Kahn resided at the Arizona residence for a period, received calls forwarded from the Wyoming office, and scheduled appointments and arranged payments and money transfers. The nexus is further supported through Special Agent Patterson's opinion that drug traffickers keep drug-related records in their homes. Accordingly, the affidavit includes facts describing the type of crime at issue (drug trafficking), the extent of Dr. Kahn's and Lyn Kahn's opportunities to move records and conceal them (their travels between Arizona and Wyoming, and Dr. Kahn's travel between his offices and residences), the nature of the evidence sought (patient files and financial records), and the reasonable inferences regarding where a criminal would likely keep such evidence (in a residence). *See id.*

13

Defendants raise several objections to the magistrate judge's nexus determination, none of which are availing. Although Defendants show that the magistrate judge could have reached a different conclusion, they do not show that the magistrate judge's probable cause determination lacked a "substantial basis." *Id.* at 1281. For example, Defendants assert that the magistrate judge could have distinguished Special Agent Patterson's expertise with a "standard drug trafficking case" from "a case involving a doctor accused of prescribing outside the scope of professional practice." Dr. Kahn's Br. at 21; *see also* Nabeel's Br. at 42. Yet, even assuming Special Agent Patterson's opinion is entitled to no weight, "[a]dditional evidence connecting a defendant's suspected activity to his residence may also take the form of inferences a magistrate judge draws from the [g]overnment's evidence." *Biglow,* 562 F.3d at 1280 (internal quotation marks omitted). Here, such an inference is supported by the intercepted call in which Dr. Kahn indicated he was going to bring patient files from his Wyoming office to his Wyoming residence.

Defendants also assert that the intercepted call only showed that Dr. Kahn brought records to his Wyoming residence, and only "on one occasion" while cleaning his office. Dr. Kahn's Br. at 19; Nabeel's Br. at 43. Defendants contrast the Wyoming residence with the Arizona residence, which they describe as a "secondary residence at which there is no reason to believe [Dr. Kahn] spen[t] any significant time." Dr. Kahn's Br. at 21; *see also* Nabeel's Br. at 42 ("Dr. Kahn had moved to Wyoming more than a year before the search [of the Arizona residence]."). Yet, Dr. Kahn regularly traveled from Wyoming to Arizona to see patients, where he

14

maintained a medical office. Thus, given the transient nature of Dr. Kahn's practice between his offices and homes in Wyoming and Arizona, the magistrate judge could have concluded that Dr. Kahn brought records to his Arizona residence as he had in Wyoming. Further, Lyn Kahn resided at the Arizona residence in October 2016 and used her cellular phone to schedule appointments and arrange payments. Thus, the magistrate judge could also have concluded that Lyn Kahn, a co-conspirator, also kept records at the Arizona residence. Even considering Defendants' counterarguments collectively, the magistrate judge's probable cause finding is supported by a substantial basis and may not be disturbed under our "very deferential" review. *Riccardi,* 405 F.3d at 860.

### 3. *Special Agent Patterson's Affidavit Established Probable Cause as to All Patients Included in the Warrant*

Dr. Kahn also asserts that, even if a nexus were established to support a warrant to search the Arizona residence, Special Agent Patterson's affidavit only established probable cause as to the eight patients explicitly described, but did not provide probable cause to search for and seize the records of all fifty-one patients. *See* Dr. Kahn's Br. at 25. Special Agent Patterson averred that all fifty-one patients showed "red flags," including "extremely high dosage amounts, patients traveling from out of state, multiple patients from the same household receiving controlled substance prescriptions, lack of individualized therapy, early refills, dangerous drug combinations and overlapping controlled substance prescriptions with Dr. Kahn's Arizona and Wyoming DEA registrations being utilized." App., Vol. III at 153–54.

15

Those red flags were identified by reviewing computerized "prescription drug monitoring program" information in both Arizona and Wyoming. *Id.* at 153. Accordingly, the magistrate judge could have concluded that the eight patients explicitly described in the affidavit were illustrative of the remaining "red flagged" patients, and thereby provided a "substantial basis" for the magistrate judge's probable cause determination as regards the more generally described patients. *Biglow*, 562 F.3d at 1281.

### 4. The Seizure of U.S. Currency and Firearms Was Permitted Under the Plain View Doctrine

The government concedes that the Arizona warrant did not authorize seizure of U.S. currency, firearms, or automobiles. The government asserts that the U.S. currency and firearms were properly seized under the plain view doctrine. Defendants counter that the plain view doctrine does not apply here because further investigation was required to establish probable cause. Defendants also argue that the plain view doctrine cannot apply because the discovery of those items was not "inadvertent." *See* Dr. Kahn's Br. at 31.

"The plain view doctrine allows a law enforcement officer to seize evidence of a crime, without violating the Fourth Amendment, if (1) the officer was lawfully in a position from which the object seized was in plain view, (2) the object's incriminating character was immediately apparent (i.e., there was probable cause to believe it was contraband or evidence of a crime), and (3) the officer had a lawful

16

right of access to the object." *United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006) (internal quotation marks omitted).

Contrary to Defendants' assertion, there is no inadvertent discovery requirement under the plain view doctrine. Defendants rely on language from Justice Stewart's plurality opinion in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971). There, Justice Stewart wrote: "If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of 'Warrants . . . particularly describing . . . [the] things to be seized.'" *Id.* at 471. The Supreme Court has since expressly rejected Justice Stewart's reasoning in *Coolidge* and the "inadvertent discovery requirement." *Horton v. California,* 496 U.S. 128, 138–39 (1990); *see also id.* at 141 ("If the interest in privacy has been invaded, the violation must have occurred before the object came into plain view and there is no need for an inadvertence limitation on seizures to condemn it."). Thus, under current Supreme Court precedent an officer may, if on the premises pursuant to a valid warrant or under an exception of the warrant requirement, seize items which immediately appear to be evidence or contraband of a crime. *See United States v. Le*, 173 F.3d 1258, 1269 (10th Cir. 1999) ("We think it clear that the inadvertence requirement is no longer a necessary condition for a legal 'plain view' seizure.").

Because Defendants do not challenge whether the objects were in "plain view" or whether officers had a right of access to the objects (presuming the warrant was valid), they only question whether "the object's incriminating character was

17

immediately apparent." *Angelos*, 433 F.3d at 747. The parties dispute whether the incriminating character must be "immediately apparent" at the time of the search, or at the time of the seizure. Defendants assert that the plain view doctrine does not apply to the U.S. currency or firearms because the incriminating nature of those items was not "immediately apparent" upon their discovery. Rather, the officers only developed probable cause after questioning Nabeel for more than an hour. The government responds that the items were properly seized because their incriminating nature was immediately apparent at the time of their seizure.

The time at which probable cause must be "immediately apparent" depends on the nature of the privacy invasion. All parties rely on *Arizona v. Hicks*, 480 U.S. 321 (1987). The officers in *Hicks* entered an apartment without a warrant under the exigent circumstance of investigating a shooting. The Supreme Court held that the plain view doctrine did not permit police to record serial numbers on stereo equipment if doing so required police to move the equipment because moving the objects "produce[d] a new invasion of respondent's privacy unjustified by [other circumstances] that validated the entry." *Id.* at 325. Yet in *Hicks*, unlike here, the privacy invasion was a warrantless search of the defendant's property, i.e., moving the stereo. Thus, *Hicks* stands for the proposition that to *search* an object under the plain view doctrine, its criminal nature must be immediately apparent at its initial discovery.

To *seize* an object, however, the criminal nature must be apparent at its seizure. Accordingly, "[a]long with numerous other circuits, we have upheld the

18

plain view *seizure* of documents even when the police only learned of the documents' incriminating nature by perusing them during a *lawful search* for other objects." *United States v. Soussi*, 29 F.3d 565, 570 (10th Cir. 1994) (emphases added); *see also United States v. Johnston*, 784 F.2d 416, 420 (1st Cir. 1986) (holding probable cause must be established during the search, but not the moment of discovery, because "[police] are not limited by the chance of which room they happen to search first").

Here, the officers had probable cause to seize the U.S. currency upon its discovery. Special Agent Patterson, who supervised the search of the Arizona residence, had other evidence tying the U.S. currency to Dr. Kahn's drug enterprise. For example, in his affidavit in support of the warrant, Special Agent Patterson described evidence showing that Dr. Kahn sold prescription medication for cash, that Dr. Kahn had collected more than $3,000,000 from such sales, that Dr. Kahn (like other drug traffickers) likely kept bulk cash in his residence, possibly in a safe, and that on one occasion Dr. Kahn discussed bringing a safe home, albeit to his Wyoming residence. Thus, upon learning of bulk cash stored in a safe (or safes), Special Agent Patterson had probable cause to believe that cash was evidence of Dr. Kahn's illegal activity.

Defendants assert that the officers lacked probable cause to seize the cash because one of the very purposes of the search was to determine whether Dr. Kahn was issuing unlawful prescriptions. Defendants' argument conflates the burden of proof to sustain a conviction with probable cause to seize evidence; although the government may have required further evidence to *prove* a drug conspiracy, the

19

officers had probable cause to *seize* bulk cash. Further, even assuming officers lacked probable cause to believe bulk cash would be discovered at Dr. Kahn's Arizona residence, upon its discovery, the officers had probable cause to believe the cash was evidence of Dr. Kahn's illegal activity. *Horton*, 496 U.S. at 139 ("[I]f [an officer] has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first.").

The officers also had probable cause to seize the firearms as contraband after questioning Nabeel. Nabeel informed Special Agent Patterson that the firearms were his, were registered to another, and that he was "not allowed" to own the firearms. App., Vol. VI at 353. Officers also discovered conflicting forms of identification. Defendants do not challenge the voluntariness of Nabeel's incriminating statements or the discovery of the conflicting identification cards during that search. Thus, the officers had probable cause to believe that Nabeel was an alien in unlawful possession of a firearm. *See* 18 U.S.C. § 922(g)(5).

### 5. *The Officers Did Not Grossly Exceed the Scope of the Warrant*

Defendants next assert that, by seizing numerous items not mentioned in the warrant, the officers grossly exceeded the scope of the warrant, thereby requiring blanket suppression.

"When law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement [under the Fourth Amendment] is

20

undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant." *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988) (*Medlin II*).  In *Medlin II,* the warrant authorized the search and seizure of "firearms—illegally possessed by Arvle Edgar Medlin, and/or stolen firearms, records of the purchase or sale of such firearms by Medlin, which are fruits, evidence and instrumentalities of [unlawful possession of a firearm by a convicted felon]." *Id.* at 1195.  In addition to seizing 130 firearms from Medlin's residence, officers also seized 667 items of suspected stolen property.  This court found that the 667 items were not seized pursuant to a warrant and were not seized under any exception to the warrant requirement.  We then affirmed the district court's factual finding that "the seizure of the 667 items was 'not mitigated by practical considerations' and that [the officer] 'employed the execution of the federal search warrant as a fishing expedition.'"  *Id.* at 1199.

Similarly, in *United States v. Foster*, 100 F.3d 846, 851 (10th Cir. 1996), we concluded that the seizure of "anything of value" grossly exceeded the scope of the warrant, and thus merited blanket suppression.  In addition to seizing the drugs and guns listed in the warrant, officers also seized, without explanation, a "BB gun, drill, TVs, lawnmower, coveralls, socket set, clock radio, coins, knives, [and] jewelry." *Id.* at 850.  Thus, the search presented "one of those exceedingly rare cases" in which blanket suppression was appropriate. *Id.* at 852.

Here, blanket suppression is unwarranted.  The facts of this case do not begin to resemble those of *Medlin II* or *Foster*.  Here, only the automobiles were seized

21

without an exception to the warrant requirement. Moreover, even if an exception to the warrant requirement did not apply to the U.S. currency or firearms, the officers' departures from the warrant were not as gross as those in *Medlin II* or *Foster*. Contrary to Dr. Kahn's assertion, the officers did not "seize[] 'anything of value' they came across." Dr. Kahn's Br. at 32. Unlike *Foster*, the officers did not seize items that were unrelated to the warrant's purpose and focus like tools, clothes, or household appliances. In short, the record does not indicate that officers turned the warrant into a "general warrant."[5]

## B. The Search of the Wyoming Residence Did Not Violate the Fourth Amendment

Dr. Kahn also asserts that the search of his Wyoming residence lacked probable cause. According to Dr. Kahn, DEA Investigator Robert Churchwell's affidavit in support of the warrant for the Wyoming search differed from Special Agent Patterson's affidavit in support of the warrant for the Arizona search in two important ways. First, Investigator Churchwell's affidavit "did not include any opinion as to whether drug dealers tend to keep records or drug paraphernalia at home." Dr. Kahn's Br. at 22. Second, Investigator Churchwell's affidavit did not inform the magistrate judge when Dr. Kahn stated he planned to bring patient files from his Wyoming office to his Wyoming residence.

---

[5] Because we sustain the search of the Arizona residence on other grounds, we decline to address the government's good faith and severability arguments.

22

Neither of these distinctions affects our analysis. As explained above, "[a]dditional evidence connecting a defendant's suspected activity to his residence may also take the form of inferences a magistrate judge reasonably draws from the [g]overnment's evidence." *Biglow,* 562 F.3d at 1280 (internal quotation marks omitted). Thus, the affidavit's failure to include an opinion regarding where drug dealers tend to keep records is not necessarily fatal. Just as the facts provided in Special Agent Patterson's affidavit established a nexus to the Arizona residence, the facts provided in Investigator Churchwell's affidavit similarly established a nexus to the Wyoming residence.

Further, the intercepted call in which Dr. Kahn indicated he would bring patient files to his Wyoming residence was not too stale. "[W]hether the information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990) (internal quotations omitted). In *Snow*, we held that an affidavit containing "undated hearsay" was not stale, where the investigation occurred over a five week period, the defendant was "running an ongoing, continuous operation to defraud the government," and the items sought "were of the type that would be kept for some time given the nature of [the] defendant's activities." *Id.* Here, as in *Snow*, the government was investigating ongoing and continuous criminal activity, making the passage of time "less critical." *Id.* Also, Dr. Kahn's patient files would likely be kept for some time, as opposed to being regularly recycled or destroyed. Thus, considering the nature of Dr. Kahn's

23

criminal activity and the nature of the property to be seized, the intercepted call was not too stale. *See also Riccardi*, 405 F.3d at 861 (holding that, in a child pornography prosecution, a five-year old copy shop receipt was not too stale because it showed the defendant had the "desire and ability" to convert sexually explicit photographs of minors into digital format).

## C. The Search of Vape World Did Not Violate the Fourth Amendment

Dr. Kahn also asserts that Investigator Churchwell's affidavit failed to establish a nexus to Vape World because there was no evidence of "ongoing and continuous" criminal activity at that business location. Dr. Kahn's Br. at 24. A "source of information" informed investigators that, on at least one occasion, Dr. Kahn instructed a patient to pick up his prescription outside of Vape World. App., Vol. III at 191. Financial records also showed that Dr. Kahn and Lyn Kahn owned Vape World, that Vape World generated thousands of dollars in cash deposits and credit card transactions, and that a personal check for $300 from one of Dr. Kahn's Arizona patients was deposited in an account associated with Vape World. Investigator Churchwell opined that, based on his training and experience, "drug traffickers sometimes use legitimate businesses to conceal unlawfully obtained drug proceeds either through financial institutions or bulk cash storage." *Id.* at 193. These facts provided a "substantial basis" for the magistrate judge's probable cause determination. *Biglow*, 562 F.3d at 1281.

**D. A Practitioner May Be Convicted for Prescribing Controlled Substances Either Outside the Scope of Professional Practice *or* Not for a Legitimate Medical Purpose**

Defendants ask us to revisit our prior holding that a licensed physician may be convicted under 21 U.S.C. § 841 for either prescribing "outside the scope of professional practice" *or* "for no legitimate medical purpose." *See United States v. Nelson,* 383 F.3d 1227 (10th Cir. 2004). Because one panel may not overturn a decision by a prior panel, we must reject Defendants' challenge. *United States v. Caiba-Antele*, 705 F.3d 1162, 1165 (10th Cir. 2012) ("[W]e are bound by the precedent of prior panels absent en banc reconsideration or a superceding contrary decision by the Supreme Court." (quoting *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993))).

In any event, our prior holding in *Nelson* is sound. Under § 841(a)(1), drug distribution is only unlawful "except as authorized by this subchapter." As we found in *Nelson*:

> The exact extent of the authorization is described in 21 C.F.R. § 1306.04(a): "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." In other words, a practitioner is authorized to dispense controlled substances only if he acts with a legitimate medical purpose *and* in the usual course of professional practice. Conversely, a practitioner would be unauthorized to dispense a controlled substance if he acts without a legitimate medical purpose *or* outside the usual course of professional practice.

*Nelson*, 383 F.3d at 1233 (emphasis in original).

25

Other circuits have reached the same conclusion. *See, e.g.*, *United States v. Armstrong*, 550 F.3d 382, 399–400 (5th Cir. 2008) (collecting cases), *overruled on other grounds by United States v. Guillermo Balleza*, 613 F.3d 432, 433 n.1 (5th Cir. 2010).

**E. The District Court Properly Instructed the Jury on Good Faith**

Both Defendants challenge the district court's jury instructions on the good faith defense, but on different grounds. Nabeel asserts that the district court erred by expressly limiting its good faith instruction to Dr. Kahn, permitting the jury to convict Nabeel on less evidence than was required to convict Dr. Kahn. Dr. Kahn asserts that the district court erred by instructing the jury that a defendant's "good faith" must be reasonable, permitting the jury to convict Dr. Kahn by finding a lesser mens rea than § 841 requires.

"We review a district court's decision on whether to give a particular jury instruction for abuse of discretion and view the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *United States v. Sorensen*, 801 F.3d 1217, 1228–29 (10th Cir. 2015) (alteration and internal quotations marks omitted).

Here, the district court instructed the jury:

> The good faith of Defendant Shakeel A. Kahn is a complete defense to the charges in Count One (conspiracy to commit a federal drug crime) as well as the charges in Counts Four, Six, Seven, Eleven, Fourteen, Sixteen, Nineteen, and Twenty (knowingly and unlawfully dispensing and/or distributing Oxycodone outside the usual course of professional practice and without a legitimate medical purpose), because good faith

26

on the part of Defendant Shakeel Kahn would be inconsistent with knowingly and intentionally distributing and/or dispensing controlled substances outside the usual course of professional practice and without a legitimate medical purpose, which is an essential part of the charges. "Good faith" connotes an attempt to act in accordance with what a reasonable physician should believe to be proper medical practice.

The good faith defense requires the jury to determine whether Defendant Shakeel Kahn acted in an honest effort to prescribe for patients' medical conditions in accordance with generally recognized and accepted standards of practice.

. . .

The burden of proving good faith does not rest with a defendant because a defendant does not have any obligation to prove anything in this case. It is the [g]overnment's burden to prove to you, beyond a reasonable doubt, that a defendant knowingly or intentionally acted unlawfully.

In determining whether or not the [g]overnment has proven that a Defendant intentionally or knowingly violated the law, you should consider all of the evidence in the case bearing on the Defendant's state of mind.

Dr. Kahn's App., Vol. I at 239–40.

1. *Nabeel's Challenge to the District Court's Good Faith Instruction Is Forfeited*

Nabeel asserts that the district court erred "in instructing the jury that good faith was a defense for [Dr. Kahn] while refusing to instruct the jury that good faith was a defense for Nabeel Khan[.]" Nabeel's Br. at 2. This argument was not, however, the same as the argument Nabeel raised before the district court, and thus we decline to consider it.

27

During trial, Nabeel submitted a written objection to the district court's proposed good faith instruction. In his objection, Nabeel asserted that he "is not a doctor and cannot be held to the same standard as Dr. Kahn when assessing the charges and his good faith belief that what he was doing was not a crime." App., Vol. II at 1635. Nabeel attached a proposed good faith instruction, which would have instructed the jury that "good faith of a defendant, whether or not objectively reasonable, is a complete defense to the crimes charged, because good faith on the part of a defendant is inconsistent with specific intent, which is an essential part of the charges." *Id.* at 1637.

At the jury instruction conference, the district court furnished a new good faith instruction, acknowledging that it had "pulled a surprise upon counsel." *Id.*, Vol. VI at 4549. Nabeel again objected, informing the district court that "a good faith instruction is important as [Nabeel] is not being held to the same standard as a doctor, and that he should, as [his counsel] indicated in [a prior written objection], be held to a good faith belief that what he was doing was not a crime." *Id.*

A party objecting to jury instructions must "inform the court of the specific objection and the grounds for the objection . . . ." Fed. R. Crim. P. 30(d). Failure to do so "precludes appellate review, except as permitted under Rule 52(b) [i.e., plain error]." *Id.* The "heart" of Rule 30(d) requires that the objection "be made with specificity and distinctness." *United States v. Allen*, 129 F.3d 1159, 1162 (10th Cir. 1997) (quoting *United States v. Agnew*, 931 F.2d 1397, 1401 n.3 (10th Cir. 1991)).

28

Before the district court, Nabeel argued that he "cannot be held to the same standard" as Dr. Kahn. App., Vol. II at 1635. Yet, Nabeel now asserts that he not only can, but *must* be held to at least the same standard as Dr. Kahn. *See* Nabeel's Reply Br. at 10 (arguing "the government must prove that a lay defendant like Nabeel acted with the *same* level of culpable knowledge required to convict a prescribing practitioner like Dr. Kahn") (emphasis added). Additionally, before the district court, Nabeel rejected an "objective" good faith instruction, and instead proposed a "subjective" good faith instruction. Yet, Nabeel now asserts not only that he is entitled to an "objective" good faith instruction, but that such an instruction was required because it was provided to Dr. Kahn.

Because Nabeel did not raise this specific objection before the district court, we may review only for plain error. Fed. R. Crim. P. 30(d); *Allen*, 129 F.3d at 1162. Nabeel does not argue plain error, however, so we treat the argument as waived, and decline to consider it. *United States v. Leffler*, 942 F.3d 1192, 1198 (10th Cir. 2019).[6]

---

[6] In other circumstances, we have discretion to consider a waived claim where, as here, the government does not argue waiver. *See United States v. Heckenliable*, 446 F.3d 1048, 1049 n.3 (10th Cir. 2006) (concluding the government "waived the waiver"). Under Rule 30(d), however, the forfeiture or waiver of an objection to jury instructions "precludes appellate review, except as permitted under Rule 52(b)." Thus, it is unclear whether the government may "waive the waiver" for an objection to jury instructions. In any event, we decline to exercise our discretion to review Nabeel's waived claim.

## 2. Dr. Kahn's Objection to the District Court's Good Faith Instruction Is Without Merit

Dr. Kahn asserts that the district court erred by instructing the jury that his "good faith" as a physician must be reasonable, permitting the jury to convict Dr. Kahn by finding a lesser mens rea than § 841 requires, i.e., that his actions were merely unreasonable.

Section 841(a)(1) makes it unlawful "[e]xcept as authorized by this subchapter . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance."  21 U.S.C. § 841(a)(1). One such authorization exception is provided under 21 U.S.C. § 829, which permits a registered practitioner to dispense a controlled substance with a "prescription."  A prescription is lawful, and thus the exception applies, if the prescription is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).  Accordingly, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."  *Id.*; *see also United States v. Lovern*, 590 F.3d 1095, 1099 (10th Cir. 2009) (Gorsuch, J.).

We hold that § 841(a)(1) and § 1306.04(a) require the government to prove that a practitioner-defendant either: (1) subjectively knew a prescription was issued

30

not for a legitimate medical purpose; or (2) issued a prescription that was objectively not in the usual course of professional practice. As we held in *Nelson*, the government need only prove criminal liability under one of those two prongs. 383 F.3d at 1233. As § 1306.04(a) explains, under the first prong, a prescription is valid only if it is issued "for" a legitimate medical purpose. Thus, the only relevant inquiry under that first prong is why a defendant-practitioner subjectively issued that prescription, regardless of whether other practitioners would have done the same. *See United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006) ("[T]he jury must look into a practitioner's mind to determine whether he prescribed the pills for what he thought was a medical purpose." (alterations omitted)).

Section 1306.04(a) also explains that, under the second prong, a prescription is valid only if it is issued "in" the scope of professional practice. Thus, the only relevant inquiry under that second prong is whether a defendant-practitioner objectively acted within that scope, regardless of whether he believed he was doing so. For this reason, at least when referencing the usual course of professional practice, federal case law "has rejected a subjective standard of good faith, in favor of an objective one." *United States v. Schneider*, 704 F.3d 1287, 1303 (10th Cir. 2013) (Holmes, J., concurring) (collecting cases).

Limiting consideration of a defendant-practitioner's subjective belief to the "legitimate medical purpose" prong accords with the Fifth and Eleventh Circuits. In *United States v. Norris*, the Fifth Circuit held that a jury is properly instructed when directed to consider "1) [w]hether [the defendant-practitioner] prescribed the drugs

31

for what he subjectively considered a legitimate medical purpose and 2) from an objective standpoint whether the drugs were dispensed in the usual course of a professional practice." 780 F.2d 1207, 1209 (5th Cir. 1986). In *United States v. Tobin*, the Eleventh Circuit, adopting the *Norris* framework, held that "a jury must determine from an *objective* standpoint whether a prescription is made in the 'usual course of professional practice.'" 676 F.3d 1264, 1283 (11th Cir. 2012) (emphasis in original).

The *Norris* framework is also consistent with Congress's policy goals in enacting the Controlled Substances Act ("CSA"), of which § 841(a)(1) is a part. If an objective standard applied to both prongs, a pharmacist who unknowingly filled an invalid prescription would be liable under the CSA because the prescription was not filled for a legitimate medical purpose, even if it was filled within the pharmacist's scope of professional practice. If a subjective standard applied to both prongs, a pharmacist who willingly ignored evidence that a prescription was invalid could escape liability, so long as he (even unreasonably) believed the prescription was filled for a legitimate medical purpose, and he acted within his own (unreasonable) scope of professional practice. Thus, the *Norris* framework punishes practitioners who act as "street pushers," without punishing practitioners who are acting within the scope of their professional practice. *See United States v. Moore*, 423 U.S. 122, 140 (1975) ("But the scheme of the [CSA], viewed against the background of the legislative history, reveals an intent to limit a registered physician's dispensing authority to the course of his 'professional practice.'").

Dr. Kahn's assertion that "good faith is a defense because it negates the mens rea element of the offense" is without merit. Dr. Kahn's Br. at 38. Unlike other criminal offenses, good faith does not go to mens rea for § 841 offenses involving practitioners. Rather, as numerous other circuits have recognized, good faith defines the scope of professional practice, and thus the effectiveness of the prescription exception and the lawfulness of the actus reus. *See, e.g.*, *Norris*, 780 F.2d at 1209 n.2 (affirming jury instruction stating "[a] controlled substance is prescribed by a physician in the usual course of a professional practice, and, therefore, lawfully, if the substance is prescribed by him in good faith, medically treating a patient in accordance with a standard of medical practice generally recognized and accepted in the United States"); *Tobin*, 676 F.3d at 1281 (substantially similar); *United States v. Chube II*, 538 F.3d 693, 699 (7th Cir. 2008) (substantially similar); *see also United States v. Volkman*, 797 F.3d 377, 387 (6th Cir. 2015) (affirming jury instruction stating "[i]f a physician dispenses a drug in good faith in the course of medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of accepted medical practice. That is, he has dispensed the drug lawfully"); *United States v. Vamos*, 797 F.2d 1146, 1152 (2d Cir. 1986) (substantially similar).

Dr. Kahn's assertion that this instruction permitted the jury to criminally convict him for mere acts of malpractice or negligence is also without merit. The district court instructed that Dr. Kahn need only "attempt" to act reasonably, and that such an attempt must be made in an "honest effort." Dr. Kahn's App., Vol. I at 239.

33

Further, the district court correctly instructed that the jury must reach its conclusion "beyond a reasonable doubt." *Id.* at 240. Thus, the jury could not convict Dr. Kahn for merely failing to apply the appropriate standard of care; it could only convict Dr. Kahn if it found, beyond a reasonable doubt, that Dr. Kahn failed to even attempt or make some honest effort to apply the appropriate standard of care. *See United States v. Sabean*, 885 F.3d 27, 45 (1st Cir. 2018) ("To safeguard the defendant's rights, the court emphasized that 'a sincere effort to act in accordance with proper medical practice,' even if flawed, could not undergird a guilty verdict so long as the defendant had acted in 'good faith.'"); *United States v. Wexler*, 522 F.3d 194, 206 (2d Cir. 2008) (concluding jury did not convict the defendant for "gross mistake or malpractice . . . because the instruction on good faith as to the honest exercise of professional judgment and a reasonable belief as to proper medical practice would shield [the defendant] from criminal liability for any mistake, however gross"). In short, we find no error in the district court's instructions.

## F. The District Court Properly Instructed the Jury on Intent

Dr. Kahn asserts that the district court's intent instruction unfairly burdened his right to testify because it "amount[ed] to directing the jury to disregard the defendant's testimony." Dr. Kahn's Br. at 41.

The district court instructed the jury:

> The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may

34

> consider any statements made or acts done by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent. . . . It is entirely up to you, however, to decide what facts to find from the evidence received during the trial."

Dr. Kahn's App., Vol. I at 155.

This instruction was proper, and, as Dr. Kahn concedes, is similar to language this court has upheld in prior cases. *See, e.g.*, *United States v. Vreeken*, 803 F.2d 1085, 1092 (10th Cir. 1986). Further, contrary to Dr. Kahn's assertion, the district court's instruction did not burden his right to testify. The district court left the jury free to "consider any statements made" by Dr. Kahn, and to decline to consider any other facts or circumstances. Thus, the jury instruction did not "arbitrarily single out his testimony, and denounce it as false." *Reagan v. United States*, 157 U.S. 301, 305 (1895). Nor did the district court "highlight[] a testifying defendant's deep personal interest in the outcome of a trial." *United States v. Gaines*, 457 F.3d 238, 247 (2d Cir. 2006) (discussing *Reagan*). Rather, the district court properly left weighing the competing evidence "entirely" up to the jury. Dr. Kahn's App., Vol. I at 155.

## G. The Evidence Was Sufficient to Convict Nabeel of Conspiracy

Nabeel asserts that the evidence admitted at trial fails to show that he had the requisite mental state to be guilty of a drug conspiracy. Specifically, Nabeel asserts that the evidence does not show that he "knew the prescriptions underlying criminal charges were written without a legitimate medical purpose in defiance of professional standards." Nabeel's Br. at 28. According to Nabeel, because the record lacks

evidence that he had any medical education or pharmacy training, he could not have known that Dr. Kahn prescribed drugs outside the scope of professional practice.

"We review the sufficiency of the evidence to support a conviction de novo, asking only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find [the defendant] guilty beyond a reasonable doubt." *United States v. Medina-Copete*, 757 F.3d 1092, 1107 (10th Cir. 2014) (alteration in original) (citation and internal quotation marks omitted). "The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts." *United States v. Harris*, 695 F.3d 1125, 1134 (10th Cir. 2012) (internal quotation marks omitted). "We accept at face value the jury's credibility determinations and its balancing of conflicting evidence." *Medina-Copete*, 757 F.3d at 1107 (internal quotation marks omitted).

The evidence here, when considered in the light most favorable to the government, supports the jury's conclusion that Nabeel knew that the prescriptions were not issued for a legitimate medical purpose or were issued outside the scope of Dr. Kahn's professional practice. Nabeel interacted directly with patients and saw patient profiles. Nabeel also discussed patients, prices, and appointment frequencies with Dr. Kahn. Nabeel also spoke with at least one patient about a TV news report that described patients who illegally sold their prescription medication.

36

Nabeel's integral knowledge of the ongoing illegal trafficking in prescription medications is most clearly demonstrated by his role in drafting, and directing patients to complete, a "drug addiction statement." By signing that statement, patients swore that Dr. Kahn was not a "drug dealer" and that "[a]ny statement[s] to that effect made by [the patient] . . . are complete falsehoods and actionable as slander [and that the patient] unequivocally den[ies] any such statement made to that effect and they should be considered to be lies." App., Suppl. Vol. I at 134. Patients further swore that they were not an "addict" and that they "suffer from moderate to severe chronic pain that is helped by the use of prescription controlled substances." *Id.* Most concerning, the statement also required patients to agree to pay Dr. Kahn, as well as his "officers and agents," "$100,000.00 USD for each and every action, investigation, complaint, or other legal or administrative proceeding whether civil or criminal however commenced . . . as a direct and/or indirect result of any action attributable in any manner whatsoever to [the patient]." *Id.* By drafting this statement, the jury could have concluded that Nabeel knew that Dr. Kahn was in fact acting as a "drug dealer," that the prescriptions were not issued for legitimate medical purposes, and that Dr. Kahn (and "officers and agents" like Nabeel) were thus subject to criminal liability. Accordingly, when all evidence presented is considered together the evidence is sufficient to sustain Nabeel's conspiracy conviction. Because we sustain Nabeel's conspiracy conviction, we also sustain his conviction for possessing a firearm in the commission of a federal drug-trafficking crime.

Nabeel's reliance on our prior decision in *United States v. Lovern,* 590 F.3d 1095 (10th Cir. 2009) (Gorsuch, J.), is misplaced.  Unlike Nabeel, the pharmacy technician in *Lovern* "did not interact with customers; he did not see patient profiles; [and] he did not communicate with . . . doctors[.]"  *Id.* at 1105.  Further, we concluded the evidence presented in *Lovern* suggested that the technician only knew of some other unlawful activity, such as unlawfully accepting prescriptions over the internet, or failing to register as a pharmacy technician.  *Id.* at 1106.  Thus, we reversed the jury's conviction of a pharmacy technician because the evidence was insufficient to show that the defendant "knew of the particular problem that [gave] rise to liability under the CSA as opposed to . . . state law or regulation."  *Id.* at 1109.  In contrast, Nabeel offers no alternative theory for what unlawful activity he may have suspected, if not the unlawful distribution of controlled substances.

**H. The Improper Witness Testimony Did Not Require a Mistrial**

Finally, Dr. Kahn asserts that the district court erred in denying his motion for a mistrial following unfairly prejudicial testimony by a witness.

At trial, a witness for the government testified on direct examination that he was "monitoring Shakeel Kahn's jail calls while he was incarcerated."  App., Vol VI at 3857.  Dr. Kahn objected and, at sidebar, moved for a mistrial.  The government acknowledged that the witness's statement prejudiced Dr. Kahn's defense, but asserted that the prejudice could be cured by an instruction.  *Id.*  The district court then denied Dr. Kahn's motion, explaining:

> We have spent nearly a month here in this trial. This remark
> has been made. A whole lot of money has been spent at this
> point both by the government and by [Dr. Kahn]. I am not sure
> that my instruction alone can cure any prejudice—a question
> in the jurors' mind about—about this.

*Id.* at 3858.

The district court then instructed the jury that "[t]he answer of the witness . . . is stricken with the instruction that the jury must not speculate whether or not Shakeel Kahn was incarcerated for any period after he was arrested." *Id.* at 3859–60.

Although not discussed by either party, Dr. Kahn also filed a written Rule 33 motion for a new trial, which the district court denied in a written order. The district court held that a new trial was not required because the prosecutor did not act in bad faith, the district court gave a limiting instruction, and "the remark remains highly inconsequential in light of all the other evidence and testimony presented against [Dr. Kahn] throughout the trial." *Id.*, Vol. II at 1984–85 (citing *United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008)).

We review a decision to grant or deny a mistrial for abuse of discretion. *United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir. 2000). Denial of a new trial "is an abuse of discretion only if it is arbitrary, capricious, whimsical, or manifestly unreasonable." *Lamy*, 521 F.3d at 1266. "In determining whether a new trial is required after a witness offers improper information, we consider (1) whether the prosecutor acted in bad faith, (2) whether the district court limited the effect of the improper statement through its instructions to the jury, and (3) whether the

improper remark was inconsequential in light of the other evidence of the defendant's guilt." *Id.* (internal quotations omitted).

Assuming the district court's reference to the cost and time of trial in its oral ruling was an abuse of discretion, reversal is unwarranted because there is not a "reasonable possibility" that the objectionable testimony affected Dr. Kahn's conviction. *United States v. Nunez*, 668 F.2d 1116, 1124 (10th Cir. 1981) (citing *United States v. Bishop*, 534 F.2d 214, 220 (10th Cir. 1976)). As the district court found in its written ruling and we confirm in our review of the record, the evidence of guilt in this case is overwhelming in light of the government's weeks-long presentation of patient records, patient testimony, and expert testimony. Dr. Kahn's reliance on *Decks v. Missouri*, 544 U.S. 622, 630 (2005) is misplaced. Any prejudice to Dr. Kahn arising from the witness's passing reference to "jail calls" is not remotely akin to the prejudice suffered by a defendant who is required to appear before a jury in shackles or prison garb.

### III

For the reasons set forth above, we **AFFIRM**.

40